## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | Chapter 7 |
|     MICHAEL KATES, | : | |
| | : | |
|              Debtor. | : | Bky. No. 11-15325 ELF |
| | : | |
| | : | |
| BEARD RESEARCH, INC., | : | |
| CB RESEARCH & DEVELOPMENT, INC., | : | |
| | : | |
|     Plaintiffs, | : | |
| | : | |
|     v. | : | |
| | : | Adv. No. 11-0789 ELF |
| MICHAEL KATES, | : | |
| | : | |
|     Defendant. | : | |
| | : | |

# O P I N I O N

## TABLE OF CONTENTS

**I.  INTRODUCTION**

**II.  FACTUAL AND PROCEDURAL BACKGROUND**

    **A.  Factual Background**

    **B. The Procedural History of the State Court Litigation and the Bankruptcy Proceedings**

    **C.  The Chancery Court Findings Relating to the Sanctions Award**

    **D.  The Chancery Court Findings Relating to the Compensatory Damages**

        **1.  misappropriation of trade secrets**

        **2.  breach of fiduciary duties**

3.  tortious interference with contractual relations

4.  tortious interference with prospective business relations

E.  The Debtor's Unsuccessful Appeal to the Delaware Supreme Court


III.  APPLICABLE LEGAL STANDARDS

A.  Summary Judgment

B.  Dischargeability

1.  general principles

2.  dischargeability under 11 U.S.C. § 523(a)(6)

C.  Issue Preclusion

1.  the elements of the doctrine

2.  the deductive and inductive methodologies


IV.  DISCUSSION

A.  The Sanctions Award Is Nondischargeable

1.  the Chancery Court findings in granting the adverse inference sanction

2.  the Chancery Court findings in denying the default judgment sanction

B.  The Compensatory Damages Are Nondischargeable

1.  comparison of the legal standards in DUTSA and the Bankruptcy Code

2.  the "historical" facts establish the nondischargeability of the
    Compensatory Damages

C.  Allocation of Damages for Purposes of Nondischargeability


V.  CONCLUSION

## I.  INTRODUCTION

Plaintiffs Beard Research, Inc. and CB Research & Development, Inc. hold a pre-petition

judgment against Debtor Michael Kates ("the Debtor" or "Kates") in the amount of

$6,784,872.53.  The judgment, entered in the Delaware Court of Chancery ("the Chancery

Court"), after a trial on the merits of various business tort claims asserted by the Plaintiffs, is

comprised of:

>  (a)  a sanctions award of $76,906.80 for the Debtor's spoilation of evidence
>       during the pre-trial phase of the case ("the Sanctions Award"); and
>
>  (b)  compensatory damages of $4,338,463.00, plus additional sums for pre-
>       judgment and post-judgment interest ("the Compensatory Damages").

In this adversary proceeding, the Plaintiffs seek a determination that the Sanctions Award

is nondischargeable under 11 U.S.C. §523(a)(6) and the Compensatory Damages are

nondischargeable under 11 U.S.C. §§523(a)(4) and (a)(6).

The Plaintiffs have filed a Motion for Summary Judgment ("the Motion"), relying

exclusively on the findings of fact and conclusions of law set forth in two (2) opinions issued by

the Chancery Court in support of the judgment it entered.  The Chancery Court issued the first

opinion, Beard Research, Inc. v. Kates, 981 A.2d 1175 (Del. Ch. 2009) ("Kates I") in connection

with the Sanctions Award and the second opinion, Beard Research, Inc. v. Kates, 8 A.3d 573

(Del. Ch. 2010) ("Kates II"), in connection with the award of Compensatory Damages.

The Plaintiffs assert that the factual findings and legal conclusions in the two (2) opinions

preclude the Debtor from contesting the nondischargeability of the State Court Judgment.  The

Debtor concedes that issue preclusion applies,[1] but disputes that the Plaintiffs have carried their

---

[1]    The doctrine of issue preclusion also is referred to as the doctrine of collateral estoppel.
In this Opinion, I will use the more modern term, issue preclusion.

burden entitling them to prevail at this stage of the proceeding.  In fact, the Debtor argues that the

Chancery Court's findings mandate the entry of judgment in his favor.  Resolution of the parties'

competing contentions requires a precise analysis of the Chancery Court's opinions and a careful

application of the elements of the doctrine of issue preclusion.

   As set forth below, I conclude that the Plaintiffs have established all of the elements for a

determination of nondischargeability under 11 U.S.C. §523(a)(6) with respect to both the

Sanctions Award and the Compensatory Damages.[2]  Accordingly, the Motion will be granted and

an order will be entered determining that the debt liquidated in the Chancery Court judgment

(hereafter, "the Chancery Court Judgment") is nondischargeable.


## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

   CB Research & Development, Inc. ("CB") is a chemistry-based research organization

("CRO") formed in 1991 by Charles Beard ("Beard").  A CRO is a chemistry outsourcing service

that provides chemical compounds to end users, such as pharmaceutical companies.  CB focused

its business on "one-off work"[3] and offered a catalog of compounds[4] that were ready-made and

---

[2]    Because I find the Compensatory Damages nondischargeable under §523(a)(6), it is
unnecessary to reach the merits of the Plaintiffs' §523(a)(4) claim and I will not further analyze that
claim in this Opinion.

[3]    "One-off work" refers to individual projects involving the custom synthesis of
compounds requested by clients.  Kates II, 8 A.3d at 581 n.3.  CB performed one-off work for many
customers who often contracted for repeat business.

[4]    CB based its catalog on a "tree concept," made up of seven (7) core intermediate
compounds, referred to as the "magnificent seven," that served as the trees.  From these trees, CB was
then able to construct "branches by performing reactions to create more advanced chemical

(continued...)

available for immediate delivery to customers.  Kates II, 8 A.3d at 583.

In 1999, Beard started a separate company, Beard Research, Inc. ("BR") to provide full-time equivalent chemists ("FTE") to CRO's (such as CB).  FTE's were chemists who were employed and compensated by BR to provide services to its CRO clients.  In return, the clients paid BR annual fees.

CB hired the Debtor in 1998.  He later became its Executive Vice President and Director of Marketing.  Subsequently, the Debtor received a one-third ownership interest in BR and was appointed as one of its officers and directors.  Id. at 581-82.

In December 2002, Pfizer, Inc. ("Pfizer") and CB entered into a nonexclusive contract pursuant to which Pfizer would provide funding for at least sixteen (16) FTE chemists (at $226,000.00 per year) and a minimum amount of one-off work ($950,000.00 per quarter) for three (3) years ("the Pfizer/CB Contract").  The Pfizer/CB Contract also contained a "key man clause" which permitted Pfizer to terminate the contract in the event that either Beard or Kates left the company or was reassigned, unless CB and Pfizer agreed to a replacement.  Pfizer's representative in the negotiations leading to the Pfizer/CB Contract was Alan Blize ("Blize").  Id. at 582-83.

Blize was employed by Pfizer as a "molecular broker" and managed Pfizer's relations with CB and BR.  In December 2002, Blizer left Pfizer.  However, before doing so, in July 2002, Blize accepted a job with (and paychecks from) ASDI, Inc. ("ASDI"), a competitor of the Plaintiffs.  Id. at 583.

---

[4](...continued)
intermediates."  Kates II, 8 A.3d at 583.  These branches were also offered for sale in CB's catalog.  The recipes for creating branch compounds were referred to as "experimentals."  Id.

In 2003, the Debtor and Blize engaged in numerous discussions about the possibility of the Debtor heading a custom synthesis lab at ASDI.  In December 2003, the Debtor made a presentation for ASDI's Board of Directors.  Id. at 584.  As a result of the presentation, ASDI created and financed the start-up operations of Advanced Synthesis Group, Inc. ("ASG").  Id. at 584-85.  Much like CB, ASG was created to perform custom synthesis of chemical compounds and also, sell chemical compounds through a catalog.  Kates I, 981 A.2d at 1180.  By February 13, 2004, Kates had resigned from CB and BR to become the President of ASG.  Kates II, 8 A.3d at 583.

On February 25, 2004, Beard notified Pfizer that Kates had resigned from CB and BR. Pfizer informed CB that it was considering invoking the "key man clause" in the Pfizer/CB Contract.  As a result of a meeting on April 14, 2004, CB agreed to amend the Pfizer/CB Contract.  The amended contract eliminated the one-off work and phased out funding for the FTE chemists by the end of 2004.  Id. at 586.

On behalf of ASG, the Debtor began negotiations with Pfizer to provide FTE chemists and to perform one-off work for Pfizer.  ASG and Pfizer entered into a contract in April 2004. Id. at  585-86.

In May 2004, ASG launched a catalog similar to CB's catalog featuring many of the same compounds that CB offered.  Pfizer purchased $174,760.00 worth of compounds from ASG. Before ASG started selling them, these compounds had been exclusive to CB's catalog.  ASG was selling the same compounds at roughly one-third the price of CB.  Id. at 587.

**B.  The Procedural History of the State Court Litigation and the Bankruptcy Proceedings**

The Chancery Court litigation commenced on May 5, 2005, when the Plaintiffs filed a

complaint against the Debtor and a number of other defendants (collectively, "the State Court

Defendants").[5]  Five (5) counts remained at the time of trial:

1.  Misappropriation of trade secrets

2.  Breach of fiduciary duty

3.  Aiding and abetting a breach of fiduciary duty

4.  Tortious interference with a contractual relation

5.  Tortious interference with a prospective business relation

On October 6, 2008, prior to trial, BR and CB filed a Motion for Sanctions for Spoliation

of Evidence.  The spoliation matter was heard but not decided prior to the trial on the merits.

The merits trial was conducted from March 9-13, 2009.

On May 29, 2009, the Chancery Court issued its decision in  Plaintiffs' favor and granting

the Sanctions Award.  On April 23, 2010, the Chancery Court issued its decision on the merits of

the Plaintiffs' claims, finding in favor of the Plaintiffs and against the State Court Defendants,

including the Debtor, on all but one (1) count, and awarded damages to the Plaintiffs.

After an appeal, the Delaware Supreme Court affirmed the Chancery Court judgment on

November 23, 2010.  See ASDI, Inc. v. Beard Research, Inc., 11 A.3d 749 (Del. 2010) ("Kates

III").  Together with the Sanctions Award for spoliation, the final State Court Judgment

amounted to $6,784,872.53.

On July 7, 2011, the Debtor filed a voluntary chapter 7 bankruptcy petition.  On October

---

[5]      The state court defendants included, ASG, ASDI, Blize, and three (3) former employees
of CB or BR, Gary Smith, Michael Wagaman, and Stephen Jones.

25, 2011, the chapter 7 trustee filed a report of no assets for distribution.

The Plaintiffs commenced this adversary proceeding seeking a determination that the State Court Judgment is nondischargeable pursuant to 11 U.S.C. §§523(a)(4) and (a)(6) on October 7, 2011.  The Debtor filed an answer to the complaint on November 14, 2011.  (Doc. # 4).

The Plaintiffs' filed the Motion and their supporting brief on March 8, 2012.  (Doc. #'s 9, 10).  The Debtor filed a response and brief in opposition on May 25, 2012.  (Doc. #'s 20, 21).  Plaintiffs filed a reply brief on June 8, 2012.  (Doc. # 23).

### C.  The Chancery Court findings relating to the Sanctions Award

As stated above, the Plaintiffs filed a pretrial motion for sanctions against Kates, ASG, and ASDI in the Chancery Court based on their asserted spoliation of evidence.  The evidence at issue was stored on a laptop computer in the Debtor's possession that he used for business purposes.  The Plaintiffs requested the Chancery Court impose the maximum sanction: entry of a default judgment.  Alternatively, the Plaintiffs requested the court to draw an adverse inference against the "spoliators."

The Chancery Court focused on three (3) of the Debtor's actions:

- his deletion of all ASG data and files from the original hard drive of the laptop in November 2005;

- his installation of a new hard drive in the laptop in December 2007 and failure to account for the whereabouts of the original; and

- his tampering with the laptop and deletion of certain files in July 2008, just before the Chancery Court ordered the State Court Defendants to produce it for the Plaintiffs' inspection.

Kates I, 981 A.2d at 1186.

The Chancery Court found that the Debtor had an obligation to preserve relevant information (the laptop data, in particular) and that the Debtor breached that duty in all three (3) instances.  Id. at 1186.

In considering the appropriate sanction, the Chancery Court then took the following factors into account: (1) the culpability or mental state of the party who destroyed evidence; (2) the degree of prejudice suffered by the complaining party; and (3) the availability of lesser sanctions which would avoid any unfairness to the innocent party while, at the same time, serving as a sufficient penalty to deter the conduct in the future.  Id. at 1189.

The Chancery Court first denied Plaintiffs' request for a default judgment, finding that the record did not support imposition of the maximum sanction.  The court reasoned that such a sanction is permissible only if the Debtor acted "willfully or in bad faith and intended to prevent the other side from examining the evidence" and should only be imposed "as a last resort."  Id. at 1190 (quoting Positran Mfg. v. Diebold, Inc., 2003 WL 21104954, at *2 (D. Del. May 15, 2003) and Baliotis v. McNeil, 870 F. Supp. 1285, 1290 (M.D. Pa.1994)).  The court found that while Kates acted "recklessly" in not preserving the original hard drive from the laptop computer, it was not convinced that Kates' actions were done "with any purpose of deceiving or misleading Plaintiffs or the Court."  Kates I, 981 A.2d at 1190.

Nevertheless, the Chancery Court considered and granted a less severe sanction: drawing an adverse inference as to the subject matter of the presentation made by Kates to the ASDI Board of Directors (i.e., an inference that Kates disclosed confidential information to competitors of CB and that the presentation to the ASDI Board included a "replicate" of the CB catalog).  Id. at 1193.  This decision was based upon the court's finding that the Debtor acted recklessly.

Significantly, the court defined "recklessness" as "a conscious indifference to the rights

of others,"[6] a state of mind

> reflect[ing] a knowing disregard of a substantial and unjustifiable risk. It amounts to an "I don't care attitude." Recklessness occurs when a person, with no intent to cause harm, performs an act so unreasonable and so dangerous that he or she knows, or should know, that harm will probably result.

Id. at 1192 (emphasis in original).  The court also referred to recklessness as involving conduct taken even though "the precise harm which eventuated must have been reasonably apparent but [was] consciously ignored."  Id. at 1191 (emphasis and quotation marks omitted) (quoting Jardel, 523 A.2d at 530)).[7]

   The court also awarded CB and BR the attorneys fees and expenses they incurred in bringing the sanctions motion (i.e., the Sanctions Award).  In deciding that those fees and costs could and should be awarded, the Chancery Court applied a negligence standard, which is a lower scienter standard than that employed when it granted the adverse inference sanction.[8]

---

[6]      Id. at 1191 (quoting Jardel Co. v. Hughes, 523 A.2d 518, 530 (Del. 1987)).

[7]      The scienter standard employed by the Chancery Court in granting the Plaintiffs' request for an adverse inference is critical to the outcome of this proceeding and will be discussed further in Part IV, infra.

[8]      The Chancery Court stated:

> To impose monetary sanctions, the Court need only find that a party had a duty to preserve evidence and breached that duty.  Essentially, this means that negligence alone may be sufficient to support the imposition of monetary sanctions.

Kates I, 981 A.2d at 1194 (emphasis added).

### D.  The Chancery Court Findings Relating to the Compensatory Damages

### 1.  misappropriation of trade secrets

To be liable for the misappropriation of a trade secret under the Delaware Uniform Trade

Secrets Act, 6 Del. C. §§2001-2009 ("DUTSA"), a plaintiff must show the existence of a "trade

secret"[9] and the misappropriation[10] of that trade secret.  <u>Kates II</u>, 8 A.3d at 589.

---

[9]     Under DUTSA, a "trade secret" is:

> (4) . . . information, including a formula, pattern, compilation, program, device, method, technique or process, that:
>
> > a.  Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
> >
> > b.  Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

6 Del. C. §2001(4).

[10]     DUTSA defines "misappropriation" as the:

> a.  Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> b.  Disclosure or use of a trade secret of another without express or implied consent by a person who:
>
> > 1.  Used improper means to acquire knowledge of the trade secret; or
> >
> > 2.  At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade was:
> >
> > > A.  Derived from or through a person who had utilized improper means to acquire it;
> > >
> > > B.  Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
> > >
> > > C.  Derived from or through a person who owed a duty
(continued...)

-11-

In analyzing the Plaintiffs' claim for misappropriation of trade secrets the Chancery Court

identified two (2) categories of information that constituted trade secrets: (a) the CB Tree-Based

Catalog System,[11] and (b) the CB Catalog Experimentals[12] (collectively, "the CB Trade Secrets").

The Chancery Court found that the compounds offered for sale in CB and ASG's catalogs were

so similar and ASG produced its catalog so quickly after its start up that the Debtor must have

used the CB Trade Secrets in creating ASG's catalog.  See id. at 597.  The Chancery Court also

attributed ASG's use of the CB Trade Secrets to the Debtor's "position as ASG's president, his

---

[10](...continued)

> to the person seeking relief to maintain its secrecy or
> limit its use.

6 Del. C. §2001(2).

"Improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  6 Del. C. §2001(1).

[11]     The Chancery Court described the CB Tree-Based Catalog System as:

> the information needed to set up and operate a catalog business in a fashion
> mimicking the successful way CB ran its catalog business. This information
> includes the identity of the seven key intermediate compounds that comprise the
> magnificent seven, the tree concept of creating numerous saleable compounds
> from a group of key intermediates, the strategy of having large volumes of key
> intermediates on hand from which a large number of other compounds can be
> made quickly and effectively, the experimentals, or recipes, from which large
> quantities of the magnificent seven and other catalog compounds can be made
> .  .  .   and the plan that laid out which compounds CB hoped to include in its
> catalog in the future.

Kates II, 8 A.3d 573, 590.

[12]     The CB Catalog Experimentals were the "recipes for creating advanced compounds on a large scale at high purities."  Id. at 595.

role in setting up ASG's operations, and his knowledge of the chemistry and business models of both ASG and CB."  Id. at 599.

The Chancery Court found that the Debtor acquired knowledge of the CB Trade Secrets under circumstances giving rise to a duty to maintain their secrecy or limit their use.[13]  Id.  From this, the Chancery Court determined that the Debtor knew or had reason to know that he had a duty to maintain the secrecy or limit the use of the CB Trade Secrets, but used them in derogation of his duty, all of which gave rise to liability to CB for misappropriation of Trade Secrets.  Id.

The Plaintiffs requested exemplary damages and attorney's fees for the misappropriation of the CB Trade Secrets.  Under DUTSA, a court may award exemplary damages and attorney's fees to the prevailing party "[i]f wilful and malicious misappropriation exists."  See 6 Del. C. §§2003(b) and 2004.  The Chancery Court defined willfulness as "an awareness, either actual or constructive, of one's conduct and a realization of its probable consequences," and malice as "ill-will, hatred or intent to cause injury."  Kates II, 8 A.3d at 600.  The Chancery Court declined to award exemplary damages because it found that the Debtor had no malice toward the Plaintiffs with respect to the misappropriation of the CB Trade Secrets.  Id. at 601.[14]

## 2.  breach of fiduciary duties

The Chancery Court found that as an officer and director of CB and BR, Kates owed his principals a fiduciary duty of loyalty, good faith, and fair dealing.  See Kates II, 8 A.3d at 601.

---

[13]    The Chancery Court found that the CB Trade Secrets were to be kept proprietary and it was CB's policy not to disclose information relating to its catalog business to its customers.  Id. at 596.

[14]    As explained further below, malice under DUTSA is not the same as malice under 11 U.S.C. §523(a)(6).  See Part IV.B.1., infra.

breach of fiduciary duty occurs "when a fiduciary commits an unfair, fraudulent, or wrongful act,

including misappropriation of trade secrets, misuse of confidential information, solicitation of

employer's customers before cessation of employment, conspiracy to bring about mass

resignation of an employer's key employees, or usurpation of the employer's business

opportunity." Id. at 602 (citing Science Accessories Corp. v. Summagraphics Corp., 425 A.2d

957, 965 (Del. 1980)).

The Chancery Court determined that Kates breached his fiduciary duty by:

- disclosing confidential information (the CB Trade Secrets) to ASDI during the presentation to its Board of Directors;

- taking and using confidential information when Kates resigned and went to work for ASG;

- inducing the resignation of certain key employees of CB and BR; and

- usurping CB and BR's business opportunities.

Id. at 602-03.


### 3.  tortious interference with contractual relations

Under Delaware law, five (5) elements must be satisfied to establish a tortious

interference with contractual relations claim: "(1) a valid contract; (2) about which defendants

knew; (3) an intentional act that is a significant factor in causing the breach of such contract; (4)

without justification; (5) which causes injury." Id. at 605 (quoting AeroGlobal Capital Mgmt.,

LLC v. Cirrus Indus., 871 A.2d 428, 437 n. 7 (Del. 2005) (citation omitted)).

The Chancery Court found that the State Court Defendants did not tortiously interfere

with the Pfizer/CB Contract, reasoning that because Pfizer terminated its contract with CB

lawfully, the Plaintiffs failed to prove an essential element, i.e., a breach of contract. Kates II, 8

A.3d at 606 ("In the end . . .  Plaintiffs failed to prove that Pfizer breached its obligations under

the key man clause when it did not accept Lee as a replacement for Kates").


### 4. tortious interference with prospective business relations

To prevail on a claim for tortious interference with prospective business relations, a

plaintiff must show: (1) a reasonable probability of a business opportunity; (2) intentional

interference by a defendant with that opportunity; (3) proximate causation; and (4) damages.  Id.

at 607-08 (citing Triton Const. Co. v. E. Shore Elec. Servs., Inc., 2009 WL 1387115, at *17 (Del.

Ch. May 18, 2009), aff'd, 988 A.2d 938, 2010 WL 376924 (Del. 2010) (citation omitted)).  A

court analyzing this claim must also consider "a defendant's privilege to compete or protect his

business in a fair and lawful manner."  Kates II, 8 A.3d at 608 (quoting DeBonaventura v. Nat.

Mut. Ins. Co., 419 A.3d 942, 947 (Del. Ch. 1980)).

The Chancery Court found that the Debtor tortiously interfered with prospective business

relations (i.e., CB's business relationship with Pfizer) when the Debtor went to work for ASG

and assisted ASG in offering Pfizer a contact at a much lower rate than CB's contract.[15]

In assessing the Plaintiffs' claim for tortious interference with prospective business

relations, the Chancery Court relied on the facts that:

- Blize was in communication with Pfizer and the Debtor on many occasions,
  prior to the Debtor's departure from CB and BR;

---

[15]     In holding that the Debtor had tortiously interfered with the Pfizer/CB Contract, the
Chancery Court found that CB had a reasonable probability of a business opportunity with respect to the
Pfizer/CB Contract because the contract was to run twenty (20) more months when Pfizer terminated it.
Additionally, the Chancery Court found that CB suffered damages in the amount of $950,000.00 per
quarter for six (6) quarters plus a large portion of revenue derived from the FTE work called for in the
Pfizer/CB Contract.

- ASDI and Blize actively recruited the Debtor to leave CB by offering a fully-funded lab, thereby creating a situation in which Pfizer could terminate the existing contract with CB, yet have its product needs met;

- Pfizer met with ASG the day before Pfizer forced CB to amend its existing contract;

- the Debtor and other defendants offered Pfizer an FTE rate that was approximately 33% lower than CB's rates under the existing contract; and

- the Debtor and other defendants were overheard discussing the manner in which they were going to take away business from CB and laughed at the prospect of accomplishing this and how they were going to "bury" CB.

Kates II, 8 A.3d at 609-10.

The Chancery Court also found that the State Court Defendants intentionally interfered with CB's one-off and catalog business.  The court concluded that the State Court Defendants used confidential information to solicit CB's customers and set up a catalog that mimicked CB's, in an effort to take all of CB's business and make CB shut its doors.  Id. at 611-12.

In making these findings, the Chancery Court rejected the State Court Defendants' defense that they had a privilege to compete in a fair and lawful manner and found that they did not act in such a manner, as evidenced by their misappropriation of the CB Trade Secrets and other confidential material.  More specifically, according to the Chancery Court, Kates was liable because he schemed with Blize to bury CB, took large amounts of CB material with him from CB to ASG, solicited former CB customers, and was in charge of ASG while it improperly competed with CB.  Id. at 612.

### E.  The Debtor's Unsuccessful Appeal to the Delaware Supreme Court

The Debtor appealed the Chancery Court's decision to the Delaware Supreme Court.  The

Delaware Supreme Court found that the evidence established that the appellants tortiously

interfered with contractual relations between the research companies, CB and BR, and Pfizer.

The Delaware Supreme Court overturned the Chancery Court's finding that there was no tortious

interference with the Pfizer/CB Contract, reasoning that even though the Pfizer/CB Contract was

lawfully terminated, appellants' wrongful conduct induced the termination.  See Kates III, 11

A.3d at 750-51.  The court stated that the Chancery Court should have focused on the

defendant's wrongful inducement of a contract termination, not whether the termination itself

was legally justified.  See id. at 751.


## III.  APPLICABLE LEGAL STANDARDS

### A.  Summary Judgment

A moving party is entitled to summary judgment by demonstrating that "there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a); see, e.g., Liberty Lincoln-Mercury, Inc. v. Ford Motor Co., 676 F.3d 318,

323 (3d Cir. 2012).

Under Rule 56, the moving party is entitled to judgment as a matter of law if the court

finds that the motion alleges facts which, if proven at trial, would require a directed verdict in

favor of the movant.  Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  "[I]t is

inappropriate to grant summary judgment in favor of a moving party who bears the burden of

proof at trial unless a reasonable juror would be compelled to find its way on the facts needed to

rule in its favor on the law." United States v. Donovan, 661 F.3d 174, 185 (3d Cir. 2011)

(quoting El v. Se. Pa. Transp. Auth., 479 F.3d 232, 238 (3d Cir. 2007)).  If the moving party

meets its initial burden, the responding party may not rest on the pleadings, but must designate

specific factual averments through the use of affidavits or other permissible evidentiary material

which demonstrate a genuine issue of material fact to be resolved at trial.  Celotex Corp. v.

Catrett, 477 U.S. 317, 324 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-50

(1986).

The court's role is not to weigh the evidence, but to determine whether there is a

disputed, material fact for resolution at trial.  Anderson, 477 U.S. at 249.  A genuine issue of

material fact is one in which the evidence is such that a reasonable fact finder could return a

verdict for the non-moving party.  Id. at 248.  The court must view the underlying facts and make

all reasonable inferences therefrom in the light most favorable to the party opposing the motion.

Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995); United States v. 717 South

Woodward St., 2 F.3d 529, 533 (3d Cir. 1993).  Thus, if it appears that the evidence "is so

one-sided that one party must prevail as a matter of law," the court shall enter judgment

accordingly in that party's favor.  Anderson, 477 U.S. at 252.

A party's burden of proof plays an essential role in determining the merits of a summary

judgment motion.  Where, as here, the movant is the plaintiff and has the burden of proof at trial,

the movant must show that no reasonable jury could find for the non-moving party.  Fitzpatrick,

2 F.3d at 1115.  The movant "must produce enough evidence to justify a directed verdict in its

favor in order to meet its initial burden."  Nat'l State Bank v. Fed. Reserve Bank of New York,

979 F.2d 1579, 1582 (3d Cir. 1992); see also In re Newman, 304 BR. 188, 193 (Bankr. E.D. Pa.

2002).  Thus, in order to prevail on the Motion, Plaintiffs must sufficiently demonstrate each

element of their claims under §523(a) and that the Debtor has not come forward with evidence to

create a triable factual dispute as to any element.


### B.  Dischargeability

### 1.  general principles

One of the Bankruptcy Code's central purposes is to permit honest debtors to reorder

their financial affairs and obtain a "fresh start," unburdened by the weight of  preexisting debt.

See In re Cohn, 54 F.3d 1108, 1113 (3d Cir. 1995); In re Marques, 358 B.R. 188, 193 (Bankr.

E.D. Pa. 2006).  Exceptions to discharge are construed strictly against creditors and liberally in

favor of debtors. E.g., Cohn, 54 F.3d at 1113; In re Glunk, 455 B.R. 399, 415 (Bankr. E.D. Pa.

2011).

A creditor objecting to the dischargeability of a debt bears the burden of proof.  In re

Cohn, 54 F.3d 1108, 1113 (3d Cir. Pa. 1995); In re Stamou, 2009 WL 1025161, *3 (Bankr.

D.N.J. Mar. 19, 2009); In re Marcet, 352 B.R. 462, 468 (Bankr. N.D. Ill. 2006).  The creditor

must establish the elements under §523(a) by a preponderance of the evidence.  See Grogan, 498

U.S. at 291; In re August, 448 B.R. 331, 357 (Bankr. E.D. Pa. 2011) (citations omitted).


### 2.  dischargeability under 11 U.S.C. § 523(a)(6)

Section 523(a)(6) excepts from discharge any debt for "willful and malicious injury by

the debtor to another entity or to the property of another entity."  11 U.S.C. §523(a)(6).  "Willful"

and "malicious" are distinct elements.  See In re Coley, 433 B.R. 476, 497 (Bankr. E.D. Pa.

2010); see also In re DiGiovanni, 446 B.R. 709, 716 n.8 (Bankr. E.D. Pa. 2011) (discussing

analytic difficulties in construing the term "willful and malicious" under existing case law), aff'd

2011 WL 4359990 (E.D. Pa. Sept. 16, 2011).  Cf. In re Williams, 337 F.3d 504, 509 (5th Cir.

2003) (condensing "willful and malicious" into a single inquiry).

      The term "willful" refers to a deliberate or intentional injury, not just a deliberate or

intentional act that leads to injury.  E.g., Coley, 433 B.R. at 497 (citing Kawaauhau v. Geiger,

523 U.S. 57 (1998)).  "[A]ctions taken for the specific purpose of causing an injury as well as

actions that have a substantial certainty of producing injury are 'willful' within the meaning of §

523(a)(6)."  Coley, 433 B.R. at 497 (citing In re Conte, 33 F.3d 303, 307-09 (3d Cir. 1994)).[16]

      "Malice" refers to actions that are wrongful and without just cause or excuse, even in the

absence of personal hatred, spite or ill-will.  4 Collier on Bankruptcy ¶ 523.12 [2] (Alan N.

Resnick, Henry J. Sommer eds., 16th ed. 2009).

> Malice does not mean the same thing for nondischargeability purposes under §
> 523(a)(6) as it does in contexts outside of bankruptcy. In bankruptcy, debtor may
> act with malice without bearing any subjective ill will toward plaintiff creditor or
> any specific intent to injure same.

In re Wooten, 423 B.R. 108, 130 (Bankr. E.D. Va. 2010) (citation omitted) (emphasis added); see

---

[16]      In Conte, the Third Circuit did not expressly resolve an important issue: whether the
"substantial certainty of producing injury" standard is measured objectively (i.e., whether there was an
objective, substantial certainty of the injury resulting as a consequence of the debtor's deliberate action,
that would have been known by a reasonable person) or whether it is measured subjectively (i.e., the
debtor was aware that the injury was a substantially certain consequence of the deliberate conduct).  See
In re Connor, 302 B.R. 509, 514 (Bankr. W.D. Pa. 2003) (dictum).

      Most of the courts in this Circuit that have considered the issue have held that Conte
mandates application of the subjective standard.  See In re Adalian, 2012 WL 5384094, at *4 (Bankr.
M.D. Pa. Nov. 5, 2012); In re Glenn, 470 B.R. 731, 736 (Bankr. M.D. Pa. 2012); In re Benun, 386 B.R.
59, 77 (Bankr. D.N.J. 2008); see also August, 448 B.R. at 358 (quoting In re Su, 290 F.3d 1140, 1144 (9th
Cir. 2002)) (§523(a)(6) renders a debt nondischargeable "when there is either a subjective intent to harm,
or a subjective belief that harm was substantially certain").  But see In re Reath, 368 B.R. 415, 426
(Bankr. D.N.J. 2006) (dictum); In re Conner, 302 B.R. 509, 515 n.4 (Bankr. W.D. Pa. 2003) (dictum).

also In re Vidal, 2012 WL 3907847, at *28 (Bankr. E.D. Pa. Sept. 7, 2012).

Thus, the Plaintiffs must establish three (3) elements demonstrating that the debt arose

from an injury to the Plaintiffs that was:

      (1)  willful (i.e., involving deliberate and intentional conduct);

      (2)  intended or substantially certain to cause injury; and

      (3)  malicious (i.e., wrongful).

See In re Jacobs, 381 B.R. 128, 144-45 (Bankr. E.D. Pa. 2008).


### C.  Issue Preclusion

### 1.  the elements of the doctrine

"Issue preclusion is based upon the policy that 'a losing litigant deserves no rematch after

a defeat fairly suffered, in adversarial proceedings, on an issue identical in substance to the one

he subsequently seeks to raise.'"  Dici v. Commw. of Pa., 91 F.3d 542, 547 (3d Cir. 1996)

(quoting Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 107 (1991)).  Generally, the

doctrine is applicable in bankruptcy proceedings involving the determination of the

dischargeability of a debt.  Grogan v. Garner, 498 U.S. 279, 285 (1991).

The application of issue preclusion based on a prior state court judgment is grounded in

the full faith and credit statute, 28 U.S.C. §1738, which provides that state judicial proceedings

"shall have the same full faith and credit in every court within the United States . . . as they have

by law or usage in the courts of such State . . . from which they are taken."  See also Marrese v.

Amer. Academy of Orthopaedic Surgeons, 470 U.S. 373, 380 (1985).  Thus, in this proceeding,

the Chancery Court findings are entitled to the same preclusive effect in this court as they would

receive in the courts of Delaware.

Under Delaware law, issue preclusion applies when

    (1)   [t]he issue previously and necessarily decided is identical with the one presented in the action in question;

    (2)   the prior action has been finally adjudicated on the merits;

    (3)   the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication; and

    (4)   the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

Betts v. Townsends, Inc., 765 A.2d 531, 535 (Del. 2000) (citation omitted); accord M.G. Bancorporation v. Le Beau, 737 A.2d 513, 520 (Del. 1999); Tyndall v. Tyndall, 238 A.2d 343, 346 (Del. 1968); see also Messick v. Star Enter., 655 A.2d 1209, 1211 (Del. 1995) (emphasis added) ("Under the doctrine of collateral estoppel, if a court has decided an issue of fact necessary to its judgment, that decision precludes relitigation of the issue in a suit on a different cause of action involving a party to the first case").

## 2.  the deductive and inductive methodologies

There are at least two (2) distinct methodologies available to a bankruptcy court in nondischargeability proceedings when evaluating an argument that the issues determined in a prior proceeding are preclusive.

The first methodology, most commonly employed in cases in which the first court made no specific findings (such as a trial that culminated in a jury verdict), might be described as a "deductive" approach.  In this approach, the bankruptcy court starts with the ultimate conclusions of the first court (which usually are not in dispute) – for example, that the court entered judgment

in the creditor's favor on a particular cause of action.  The court next attempts to reconstruct

inferentially the necessary foundations of the prior decision.  If that reconstruction process is

successful, the court then compares those foundational elements of the prior court ruling to the

statutory elements of the §523(a) nondischargeability asserted by the plaintiff.  This reasoning

process may involve a purely legal analysis, e.g., a comparison of the necessary elements of the

claim litigated in the first proceeding with the elements of the bankruptcy nondischargeability

claim.[17]  Or, the bankruptcy court may consider additional materials from the first proceeding,

such as  pleadings, briefs and jury instructions, in an effort to ascertain what issues were actually

litigated before and necessarily decided by the prior court (and, if the issues were mixed fact-law

questions, the legal standard employed by the court).[18]  If the court is able to determine that

particular issues were actually and necessarily litigated in the prior proceeding – be they fact

issues or mixed fact-law issues – and concludes that they are identical to the issues in the

bankruptcy proceeding, then relitigation of those issues will be precluded.

   A second methodology, usually employed when the prior tribunal made express findings

of fact and conclusions of law, distinct from the process described above, involves what might be

---

[17]   See, e.g., In re Bosworth, 2012 WL 603715, at *5-7 (B.A.P. 9th Cir. Feb. 2, 2012); In re Grimsley, 449 B.R. 602, 616-18 (Bankr. S.D. Ohio 2011); In re Luby, 438 B.R. 817, 838-40 (Bankr. E.D. Pa. 2010);  In re Kohler, 2008 WL 5753359, at *4 (Bankr. N.D. Cal. Nov. 6, 2008); In re Langeslag, 366 B.R. 51, 59 (Bankr. D. Minn. 2007).

[18]   See, e.g., Jordan v. Moore, 2010 WL 997065 (D. Md. Mar. 16, 2010); In re Dybowski, 2012 WL 1945503 (Bankr. D. Conn. May 30, 2012); In re Luedtke, 429 B.R. 241, 244 (Bankr. N.D. Ind. 2010); In re Glunk, 2009 WL 2916975, at *2 (Bankr. E.D. Pa. May 26, 2009); In re Vepuri, 2009 WL 2921305, at *1 (Bankr. E.D. Pa. Mar. 25, 2009) (per Fox, J.), aff'd 2010 WL 1303456 (E.D. Pa. Mar. 31, 2010). Cf. Schinazi v. Tamman, 2009 WL 5088767 (S.D.N.Y. Dec. 9, 2009) (reversing bankruptcy court application of collateral estoppel due to overbroad inferences drawn from jury instructions and trial testimony).

characterized as an "inductive" rather than a "deductive" approach. By dropping down one level and focusing on the specific findings (particularly, findings of historical fact)[19] in the prior proceeding that are entitled to preclusive effect, under the inductive approach, the court evaluates whether the preclusive facts, considered in the aggregate, establish any or all of the elements of a §523(a) claim. See, e.g., In re Miera, 926 F.2d 741, 744 (8th Cir. 1991); In re Koch, 2012 WL 4090179, at *5 (D. Minn. Sept. 17, 2012); Jacobs, 381 B.R. at 143.[20]

Under either analysis, the court must always consider whether the burdens of proof or the substantive legal standards in the bankruptcy proceeding differ from those of the prior proceeding, who prevailed in the earlier matter and which party in the bankruptcy proceeding seeks to invoke the issue preclusion doctrine.

For example, if the bankruptcy plaintiff prevailed in the prior proceeding on a claim requiring a less rigorous level of scienter than that required under the willful and malicious standard of §523(a)(6), issue preclusion is not available to the plaintiff. In the same circumstances, if the debtor prevailed in the prior proceeding, the issue preclusion doctrine may provide the debtor with a complete defense to the nondischargeability claim. Conversely, if the bankruptcy plaintiff prevailed in the prior proceeding on a claim requiring an equal or more rigorous level of scienter than that required under the willful and malicious standard of

_____

[19]    Findings of "historical facts" are findings regarding "a thing done, an action performed, or an event or occurrence." William W. Schwarzer, Alan Hirsch, David J. Barrans, The Analysis and Decision of Summary Judgment Motions 14 (Federal Judicial Center 1991).

[20]    In making a decision of that nature, the bankruptcy court must remain cognizant of the procedural stage of the adversary proceeding. If the matter is being considered on summary judgment, the court should grant summary judgment only if there are no disputed facts. Of course, the court has more leeway in drawing its conclusions from the record if the matter is being decided after trial.

§523(a)(6), issue preclusion is available to the plaintiff; however, if the debtor prevailed in the

prior proceeding, he or she will not be able to invoke issue preclusion defensively.

A number of these nuances in the application of issue preclusion come into play in this

adversary proceeding.


## IV.  DISCUSSION

### A.  The Sanctions Award Is Nondischargeable

Analyzing the preclusive effect of the Chancery Court's decision to sanction the Debtor

for spoliation of evidence is complicated somewhat by the court's consideration of three (3)

different potential sanctions (entry of default judgment, adverse evidentiary inference and

attorney's fees/costs) and its application of different legal standards in evaluating each potential

sanction.  The bottom line, though, is that in imposing an adverse inference for the same conduct

that resulted in the monetary sanction, the Chancery Court employed and found that the Debtor's

conduct satisfied a legal standard that is consonant with the willful and malicious standard of 11

U.S.C. §523(a)(6).  Consequently, the Debtor is precluded from relitigating the issue whether the

Sanctions Award is a debt for willful and malicious injury under §523(a)(6).


### 1.  the Chancery Court findings in granting the adverse inference sanction

The material passages in the Chancery Court's analysis of the adverse inference issue are

found at 981 A.2d at 1192.  There, the court described the legal standard as follows:

> [D]rawing an adverse inference is appropriate when an actor is under a duty to
> preserve evidence and takes part in the destruction of evidence while being
> consciously aware of a risk that he or she will cause or allow evidence to be
> spoiled by action or inaction and that risk would be deemed substantial and

unjustifiable by a reasonable person.

Id. (emphasis added).

The Chancery Court found that the Debtor's conduct satisfied this standard when he

deleted documents from his laptop computer and failed to maintain and preserve his laptop hard

drive:

> Kates is a highly educated individual, having received a doctorate in chemistry,
> and a sophisticated businessman. Kates, ASDI, and ASG all were on notice by
> mid-2005 that electronic documents could be relevant to this action. Moreover,
> **Kates admitted knowing that reformatting his laptop's hard drive on
> numerous occasions could overwrite or delete data stored on the hard drive**.
> Nevertheless, around November 2005, **Kates intentionally deleted files** from the
> laptop after ASG laid him off. Moreover, in or around September 2007, Mr.
> Elzufon, then lead counsel for Kates, ASDI, and ASG, explicitly told Kates not to
> destroy his laptop. Still, within a few months, Kates had his original hard drive
> replaced by an agent of ASDI and then lost the original drive. I find, therefore,
> that Kates knew of his duties to preserve evidence, including specifically the
> information on his laptop, but **consciously disregarded those duties**. Thus, an
> adverse inference is warranted based on the replacement and subsequent loss of
> the original hard drive.

Id. (emphasis added).

The above legal standard employed by the Chancery Court and its findings of fact satisfy

the Conte definition of "willful and malicious" under 11 U.S.C. §523(a)(6).  The Debtor

voluntarily and deliberately destroyed evidence when he was aware of both his duty to preserve

the evidence and the substantial certainty that his conduct would injure the Plaintiffs (by

depriving them of access to relevant evidence).  It follows that the debt for the injury suffered by

the Plaintiffs, which includes the attorney's fees and costs they incurred in obtaining a judicial

remedy, is a nondischargeable debt for willful and malicious injury under §523(a)(6).

In reaching this conclusion, I acknowledge that the Chancery Court's articulation of the

legal standard it employed in its adverse inference analysis may not have been 100%, perfectly

consistent.  At one point in its discussion of the issue, the court referenced a definition of

recklessness that might fall short of the scienter level required by Conte (assuming that Conte

requires a subjective awareness of the substantial certainty of harm from the wrongful conduct,

see n.17, supra).  The court quoted from the Delaware Pattern Jury Instructions for Civil Practice,

which define recklessness as occurring "when a person, with no intent to cause harm, performs

an act so unreasonable and so dangerous that he or she knows, or should know, that harm will

probably result."  Id. at 1192 (emphasis added).

    After carefully reviewing the Chancery Court opinion, however, I am firmly convinced

that the court actually employed a standard consistent with the subjective Conte standard for

willfulness and malice under 11 U.S.C. §523(a)(6).  The court granted the adverse inference

sanction because it concluded that the Debtor subjectively understood that his wrongful conduct

was substantially certain to harm the Plaintiffs.  This is evident from: (1) the court's repeated

description of the requisite scienter standard using such terms and phrases as: "conscious

indifference," "consciously ignored," " a consciousness element," "consciously disregards" and

"consciously aware;" and (2) the court's specific factual finding that the Debtor admitted that he

knew that his actions would reformatting his hard drive would delete data.  Its single, isolated

reference to an objective standard stated in one legal authority does not dictate a different result

from the one reached here.  See generally In re Hughes, 2007 WL 2456072, at *6 (Bankr.  E.D.

Cal. Aug. 24, 2007) ("This court will not engage in a parsing of the critical paragraph in the

order, selecting as essential  . . .  only those words and phrases that support a more benign  . . .

finding, and omitting . . .  those that support a [contrary] finding").[21]

---

[21]     I also acknowledge that the Chancery Court held that "negligence alone may be
(continued...)

### 2.  the Chancery Court findings in denying the default judgment sanction

In contesting the Motion, the Debtor points to other findings made by the Chancery Court – those made in denying the Plaintiffs' request for a default judgment.  He asserts that these findings establish preclusively that his conduct was not willful and malicious.  However, as explained below, the Debtor's argument fails to take into account differences in the legal standard the court employed in making that decision.  Those differences deprive the findings that were more favorable to the Debtor of preclusive effect in this adversary proceeding.

The Chancery Court stated that a default judgment is appropriate only if (1) the spoliator acted willfully or in bad faith, (2) the spoliator acted with the intent of preventing the other side from examining the evidence; and (3) its entry is necessary as a last resort because no other, lesser sanction would be more appropriate.  <u>Kates I</u>, 981 A.2d at 1190.  The court denied the request, stating that it found that the Debtor acted "recklessly," but without any "purpose of deceiving or misleading Plaintiffs or the Court" and therefore, declined to grant the default judgment.  <u>Id.</u>

---

[21](...continued)
sufficient" for the imposition of monetary sanctions.  <u>Kates I</u>, 981 A.2d at 1194.  And, it is axiomatic that a finding of nondischargeability under §523(a)(6) requires a higher level of scienter than negligence.  <u>See, e.g.</u>, <u>Printy v. Dean Witter Reynolds, Inc.</u>, 110 F.3d 853, 859 (1ˢᵗ Cir. 1997) (citing 4 <u>Collier on Bankruptcy</u> ¶ 523.12 (15th ed. 1996)); <u>In re St. Johns</u>, 2011 WL 7109370, at *2 (Bankr. W.D. Pa. July 26, 2011); <u>In re Kaplan</u>, 162 B.R. 684, 703 (Bankr. E.D. Pa. 1993), <u>aff'd</u> 189 B.R. 882 (E.D. Pa. 1995).  Thus, the Chancery Court's use of a negligence standard to evaluate the Plaintiffs' claim for attorney's fees and costs, by itself, would not support the Plaintiff's nondischargeability claim under §523(a)(6) claim as  to the Sanctions Award.  Indeed, even if the Chancery Court had made a finding that the Debtor's state of mind was "willful and malicious" in awarding the Plaintiffs attorney's fees and costs as a spoliation sanction, such a finding likely would not have been necessary to its decision and therefore, it would not be preclusive.  However, the Chancery Court evaluated the Debtor's very same conduct when it granted the Plaintiffs' request for an adverse evidentiary inference.  In doing so, it evaluated that conduct against a higher scienter standard under applicable Delaware law – a standard, as discussed above, that is consonant with §523(a)(6).

-28-

Read in isolation, the Chancery Court's statement that the Debtor acted "recklessly" suggests that his conduct was not willful and malicious under 11 U.S.C. §523(a)(6). It is, after all, black letter law, that "recklessness" does not suffice to establish willfulness and malice under §523(a)(6). See Geiger, 523 U.S. at 64. Nonetheless, for four (4) reasons, I conclude that the Chancery Court findings on the default judgment issue are not in conflict with its findings on the adverse inference issue, discussed above, which support the nondischargeability determination under 11 U.S.C. §523(a)(6).

First, in considering the propriety of entering a default judgment, the Chancery Court articulated a legal standard that required willfulness or bad faith, with the intent of preventing the other side from examining the evidence. This reads like a specific intent standard, one that is higher, or more difficult to establish, than the Conte "substantial certainty" of causing harm requirement. My reading of the Chancery Court opinion as a whole suggests that the court was convinced that, at a minimum, the Debtor knowingly and consciously disregarded his obligations to preserve evidence, but was unwilling to go further and find that the Debtor did so with the specific purpose or goal of harming the Plaintiffs. Thus, as discussed in Part III.C., the Plaintiffs' failure to meet the higher, specific intent standard in the prior proceeding does not preclude them from attempting to prove that the Debtor's scienter satisfied the less rigorous standard of §523(a)(6). See In re Painter, 285 B.R. 662, 668 (Bankr. S.D. Ohio 2002); 18 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure §4422 (2d ed. 2012) (Wright & Miller) (stating "the well-established principle that failure to carry a higher standard of proof on an issue does not preclude a subsequent attempt to satisfy a lower standard as to the same issue").

Further, in the "default judgment" section of its opinion, the Chancery Court did not even

define what it meant by "recklessness." To preclude the Plaintiffs from litigating its §523(a)(6)

claim based solely on the Chancery Court's unexplained use of the word "reckless"would exalt

form over substance – at least in these circumstances, where the court later in its opinion (in the

adverse inference section) defined the term in a fashion that is consistent with the §523(a)(6)

willful and malicious standard.  See Part V.A.1, supra.  Indeed, it is fair to assume that the court

used the term recklessness to mean the same thing in both parts of its opinion.  Thus, the court's

finding that the Debtor acted recklessly when it denied  Plaintiffs' request for a default judgment

is not inconsistent with a finding of willful and malicious injury in this adversary proceeding.[22]

Finally, to a lesser degree, my conclusion is influenced by the Chancery Court's statement

that a default judgment should be granted only as a last resort and only if no other, lesser sanction

is more appropriate.  The court's statement demonstrates that even if the Plaintiffs established

that the Debtor had the requisite intent in destroying evidence to justify the entry of a default

judgment, the court might nonetheless have exercised its discretion to decline their request.

When the grant or denial of relief is discretionary in this way, and the first court declines to grant

relief, it may not be appropriate to apply issue preclusion.  See Matter of Rowland, 1988 WL

73431, at *4 (D.N.J. June 13, 1988); In re Hussain, 2012 WL 1098277, at *4 (Bankr. S.D. Iowa

Mar. 30, 2012).

Here, the Chancery Court's decision declining to enter a default judgment appears to have

---

[22]    I note also that, arguably, once the Chancery Court determined that the Debtor lacked the
necessary specific intent, i.e., to interfere with the Plaintiffs access to the evidence, to warrant the entry
of a default judgment, it need not have made any further finding regarding the Debtor's scienter.  In that
respect, the recklessness finding may not have been necessary and therefore, not preclusive.  But see
Muegler v. Bening, 413 F.3d 980, 984  (9th Cir. 2005) (looking to actual findings of the jury and rejecting
argument that its verdict should not be given issue preclusive effect because applicable state law
permitted finding based upon lower standard than that required by section 523(a)(6)).

been influenced by factors other than the Debtor's intent.  For example, the court observed that

"the showing of intentional misconduct" was stronger with respect to the Debtor's deletion of the

data from his laptop in July 2008, but that particular evidence would likely have been of

"marginal" value to the Plaintiffs.  Kates I, 981 A.2d at 1190.  Thus, this is not a case in which

the Chancery Court made an express, necessary finding that the Debtor's intent in no way

justified the entry of a default judgment.  Rather, the court concluded, in its discretion, that the

adverse inference sanction was more proportionate in the totality of the circumstances.


### B. The Compensatory Damages Are Nondischargeable

As to the dischargeability of the Compensatory Damages, the Debtor asserts that the

Chancery Court's finding, in connection with its denial of the Plaintiffs' request for exemplary

damages, that the Debtor did not maliciously misappropriate the CB Trade Secrets mandates the

entry of summary judgment in his favor.[23]  The Plaintiffs do not dispute the finding, but

emphasize that it was made in the Chancery Court's analysis of the misappropriation of trade

secrets claim.  They contend that the finding does not extend to and has no bearing on the other

state law claims that were asserted – in particular, the claim for tortious interference with

prospective business relations.

As explained below, I agree with the Plaintiffs that the Chancery Court's "no malice"

finding is not preclusive in this adversary proceeding, although for a different reason than that

articulated by the Plaintiffs. I conclude that the Debtor's preclusion argument fails, once again,

---

[23]    The Debtor did not file a cross-motion for summary judgment.  However, in appropriate
circumstances (in the end, not existing here), a federal court may enter summary judgment in favor of the
nonmoving party.  See, e.g., In re Styer, 477 B.R. 584, 589 (Bankr. E.D. Pa. 2012).

because the legal standard employed by the Chancery Court in finding "no malice" was more

stringent than that necessary under 11 U.S.C. §523(a)(6).  Further, based on the Chancery Court's

other findings (more historical in nature and admitted by the Debtor to be preclusive) and after

application of the "inductive" issue preclusion methodology, I conclude that the preclusive facts

establish, as a matter of law, that the Compensatory Damages are nondischargeable under

§523(a)(6).  In short, I reach the result (only superficially counterintuitive), that notwithstanding

the Chancery Court's finding that the Debtor's conduct was not malicious under applicable

nonbankruptcy law, the conduct caused willful and malicious injury under §523(a)(6) of the

Bankruptcy Code.[24]

### 1.  comparison of the legal standards in DUTSA and the Bankruptcy Code

DUTSA and the Bankruptcy Code use the same phrase, "willful and malicious."  DUTSA

employs the term as the legal standard for the award of exemplary damages.  The Bankruptcy

Code uses the term as the legal standard for nondischargeability under §523(a)(6).  I conclude

---

[24]    Recent case law suggests that the standard of proof for awarding punitive damages under
Delaware law is based upon a preponderance of the evidence.  See Tumlinson v. Advanced Micro
Devices, Inc., 2010 Del. Super. LEXIS 619, at *7-8 n.8 (Del. Super. Ct. July 23, 2010) (stating standard
for punitive damages is preponderance of the evidence); Simon v. Beebe Med. Ctr., 2004 Del. Super.
LEXIS 76 (Del. Super. Ct. Mar. 15, 2004) (declining to apply higher clearing and convincing standard to
issue of punitive damages); see also Delaware Pattern Jury Instructions §22.27 (applying preponderance
of the evidence standard).

         Although I do not find the Chancery Court opinion explicit on this point, I have assumed
that the Chancery Court applied a preponderance of the evidence standard of proof rather than a "clear
and convincing evidence" standard. Were it otherwise, the Debtor's argument would fail immediately
because issue preclusion will not apply to prevent litigation of an issue if the party that was unsuccessful
in the first proceeding faced a higher standard of proof than that required in the in the subsequent
proceeding.  See Painter, 285 B.R. at 668; Wright & Miller §4422.  In any event, I need not further
consider this issue because the Plaintiffs have not raised it in response to the Debtor's argument and I
have rejected the Debtor's argument on other grounds.

that these terms mean different things in the two (2) statutes.

The Chancery Court stated that, under Delaware law, "willfulness is an awareness, either actual or constructive, of ones conduct and a realization of its probable consequences, while **malice is defined as ill-will, hatred or intent to cause injury**." Kates II, 8 A.3d at 600 (citing NuCar Consulting, Inc. v. Doyle, 2005 WL 820706, at *14 (Del. Ch. Apr. 5, 2005)) (internal quotations omitted) (emphasis added).

In applying DUTSA to the facts of the case, the Chancery Court stated that:

> [t]he only evidence of malice . . . was of the conversation in which Kates, Blize, and Paloni laughed about how they were going to take CB's contract with Pfizer and "bury" CB. There is no evidence, however, that the CB Trade Secrets were discussed at this meeting. Moreover, the evidence indicates that ASG was going to use Blize's contacts at Pfizer, rather than the CB Trade Secrets, to secure a contract with Pfizer, and the eventual Pfizer–ASG contract focused on FTE work, as opposed to catalog work. **While there may be some evidence of Defendants' malice towards Plaintiffs, there is no evidence connecting this malice to Defendants' misappropriation of the CB Trade Secrets. Accordingly, neither an award of exemplary damages or attorneys' fees under DUTSA is justified here**.

Kates II, 8 A.3d at 600-601 (footnote omitted, emphasis added).

Thus, at least with regard to misappropriation of trade secrets, the Chancery Court declined to award exemplary damages because it concluded that the record was devoid of evidence that the Debtor acted with ill-will or animus toward the Plaintiffs. The court applied a scienter level that can be characterized as "actual" or "specific" malice, a higher scienter level than that required under §523(a)(6) of the Bankruptcy Code.[25]   Case law under §523(a)(6) has

---

[25]       The Chancery Court opinion includes at least an implied reference to a scienter level that was "lower" than specific malice. In defining the terms "wilful" and "malicious" under §§2003 and 2004 of DUTSA, it cited NuCar Consulting. While NuCar Consulting was a misappropriation of trade secrets case, the NuCar Consulting court drew its definitions from prior case law, a Delaware Supreme Court case and a Delaware Superior Court case. See id. (citing Jardel Co., 523 A.2d at 530 and Casson v.

(continued...)

established that malice means "wrongful and without just cause or excuse, <u>even in the absence of</u>

<u>personal hatred, spite or ill-will.</u>"  <u>Collier</u>, ¶ 523.12 [2] (citing authorities) (emphasis added);

<u>accord</u> <u>Conte</u>, 33 F.3d at 309.  The <u>Conte</u> Court explained why specific malice is not required

under §523(a)(6):

> To require specific malice or some other strict standard of malice for
> non-dischargeability of a debt . . . would undermine the purposes of that provision
> and place a nearly impossible burden on a creditor who wishes to show that a
> debtor intended to do him harm. To require such specific malice would restrict §
> 523(a)(6) to the small set of cases where the debtor was foolhardy enough to make
> some plainly malevolent utterance expressing his intent to injure his creditor.

33 F.3d at 308 (quoting <u>St. Paul Fire & Marine Ins. Co. v. Vaughn</u>, 779 F.2d 1003, 1009-10 (4th

Cir. 1985)).

The issue decided by the Chancery Court is not identical to the issue in this proceeding

because the Chancery Court applied a higher level of scienter than that required by §523(a)(6) of

---

[25](...continued)

<u>Nationwide Ins. Co.</u>, 455 A.2d 361, 368 (Del. Super. 1982)).  Both <u>Jardel</u> and <u>Casson</u> were tort claims in which the courts applied standards of conduct that included willful and wantonness, reckless indifference and bad faith – all arguably lower levels of scienter as compared to actual malice.

Other Delaware courts also appear to have defined malice under DUTSA as requiring something less than a specific ill-will, hostility or specific intent to injure.  <u>See, e.g.</u>, <u>Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC</u>, 2010 WL 338219, at *28 (Del. Ch. Jan. 29, 2010) ("Malice also may be found after a party has demonstrated a reckless disregard for another's trade secrets with the intent to cause injury"); <u>Agilent Techs., Inc. v. Kirkland</u>, 2010 WL 610725, at *18 (Del. Ch. Feb. 18, 2010) (same).

Notwithstanding the citation <u>NuCar Consulting</u>, it appears that the Chancery Court actually applied a specific malice standard in evaluating the Plaintiffs' request for exemplary damages.  It is possible that in doing so, the Chancery Court applied a more rigorous standard than that required under Delaware law.  For purposes of issue preclusion, however, it does not matter whether the Chancery Court was correct or not.  The parties were ably represented by counsel and the Chancery Court's decision was affirmed by the Delaware Supreme Court.  The role of the bankruptcy court role in considering the application of issue preclusion in this adversary proceeding is limited to ascertaining what the Chancery Court <u>actually</u> found and what legal standard it <u>actually</u> employed in making its findings and comparing those legal findings and legal standards to those in the cause of action in the bankruptcy  proceeding.

the Bankruptcy Code.  As such, the Chancery Court's finding of no malicious misappropriation is

not binding on the Plaintiffs and does not preclude the Plaintiffs from pressing their §523(a)(6)

claim.[26]

**2.  the "historical" facts establish the nondischargeability of the Compensatory Damages**

The Plaintiffs contend that I should find, as a matter of law, that the Debtor's tortious

conduct was willful and malicious under 11 U.S.C. §523(a)(6) based upon the "historical facts"

found by the Chancery Court.  In other words, the Plaintiffs invoke what I earlier referred to as

the "inductive" preclusion methodology.  See Part IV, supra.  Employing the suggested

methodology, I conclude, as a matter of law, that the Debtor willfully and maliciously injured

Plaintiffs by misappropriating the CB Trade Secrets and tortiously interfering with the Pfizer/CB

Contract.

The Chancery Court's findings paint a vivid picture of the Debtor's "scheming" with

Blize and others to usurp CB's business and the Pfizer/CB Contract.  To accomplish this plan,

the Debtor capitalized on Blize's proposal for the Debtor to head up a custom synthesis lab by

pitching a business model to the Board of Directors of ASGI using CB's confidential information

to make the presentation, and in the process, breaching his fiduciary duties to CB.  The Debtor

resigned from CB and BR and accepted the position of President of ASG – an entity which was

---

[26]      Under Delaware law, awarding punitive damages is discretionary.  See e.g., 6 Del. C. §
2003 (b) ("If wilful and malicious misappropriation exists, the court may award exemplary damages");
see also In re Peterson, 332 B.R. 678, 684 (Bankr. D. Del. 2005) (citing authorities).  Thus, even if
a plaintiff meets the requisite standard for imposing punitive damages, the trier of fact may decline to
award them.  Arguably, this presents an alternative ground for declining to apply issue preclusion to the
Chancery Court's refusal to award exemplary damages and attorney's fees.  See Rowland, 1988 WL
73431, at *4;  Hussain, 2012 WL 1098277, at *4.

created to compete directly with CB and BR.  The Debtor's departure from CB thus created the

opportunity for Pfizer to cancel the Pfizer/CB Contract.  It also allowed Blize to leverage his

influence on his contacts at Pfizer to convince Pfizer to terminate its contract with CB, and

instead, enter into a lucrative contract with ASG.

      To sweeten the deal offered to Pfizer, the Debtor – through ASG – offered many of the

same chemical compounds found in CB's catalog at roughly one-third of the price.  However, the

Debtor and ASG were able to offer a catalog so rapidly after ASG's start up only by

misappropriating the CB Tree-Based Catalog System and the CB Catalog Experimentals and

using the information to create a catalog that undercut CB's prices.  The Debtor and ASG also

offered FTE's at a lower rate than in the Pfizer/CB Contract.

      Based on the concerted efforts of the Debtor and the other State Court Defendants, Pfizer

terminated the Pfizer/CB Contract at the April 14, 2004 meeting and forced CB to agree to an

amended contract.  Later, the Debtor and ASG were successful in securing a contract with Pfizer

similar to the Pfizer/CB Contract.

      The Chancery Court's opinion is replete with findings regarding the Debtor's intent to

"take away business, including the [Pfizer/CB] Contract, from CB," Kates II, 8 A.3d at 609, and

"make CB shut its doors," id. at 612.  The Chancery Court summed up its conclusions stating:

>       Kates is liable because he schemed with Blize . . . to bury CB, took large amounts
>       of CB material with him from CB to ASG, solicited former CB customers, and
>       was in charge of ASG while it improperly competed with CB.

Id.

      These findings undoubtedly equate to a determination that the Debtor acted wilfully and

maliciously (in the sense of §523(a)(6)) to injure CB by misappropriating its trade secrets and

tortiously interfering with its business contracts.  Based on the preclusive facts, no reasonable

factfinder could conclude anything other than the Debtor acted deliberately, wrongfully and with

the subjective knowledge that his conduct would injure the Plaintiffs.  Thus, the Plaintiffs have

established, as a matter of law,[27] all of the elements of nondischargeability under 11 U.S.C.

§523(a)(6).

### C.  Allocation of Damages for Purposes of Nondischargeability

The Chancery Court determined that $668,544.00 of the Plaintiffs' damages were

attributable to misappropriation of trade secrets.  It did so because one of the defendants was

liable only on that one claim.  The Chancery Court, did not otherwise allocate the damages

among the various successful claims on which the Plaintiffs succeeded.

The final issue in this proceeding is whether I must determine that all of the five (5) state

court claims comprising the Chancery Court Judgment are nondischargeable and, if any of them

are not, allocate the nondischargeable damages among the claims.  For instance, at first glance,

the damages associated with the Debtor's breach of fiduciary duty arguably may not have been

caused by conduct satisfying all of the elements under §523(a)(6).  If those damages are distinct

from other damages awarded, there should be a mechanism to separate the dischargeable debt

---

[27]      As stated earlier, the moving party is entitled to judgment as a matter of law if the court
finds that the motion alleges facts which, if proven at trial, would require a directed verdict in favor
of the movant.  Fitzpatrick, 2 F.3d at 1115.  The standard for a directed verdict is whether there is evidence
upon which the jury might reasonably find a verdict for the party against whom the motion is filed.  9B
Federal Practice & Procedure §2524; see also Feldman v. Phila. Hous. Auth., 43 F.3d 823, 828 (3d Cir.
1994) (court must evaluate motion for directed verdict by viewing the evidence in the light most
favorable to the nonmoving party and deciding whether there is evidence reasonably tending to support
his position).  I conclude that the preclusive facts would not support a verdict in the Debtor's favor on the
issues of willfulness and malice.

from the nondischargeable debt.  See e.g., In re Conner, 2010 WL 1709168, at *5 (Bankr. M.D.

Ga. Apr. 23, 2010) (finding material issue of fact with respect to how much of non-allocated state

court judgment was attributable to nondischargeable claim); In re Rownd, 210 B.R. 973, 976

(Bankr. E.D.N.C. 1997) (holding that debtor was permitted to litigate amount of compensatory

damages that were nondischargeable where jury verdict "lumped" trademark and copyright

violations with trade secret violations); In re Wiggins, 180 B.R. 676, 682-83 (M.D. Ala. 1995)

(finding error where bankruptcy court did not make factual findings as to amount of debt that was

nondischargeable under §523(a)(9)).

     As explained below, in the circumstances presented, it is unnecessary to engage in the

exercise of allocating the nondischargeable damages in this proceeding.

     The Chancery Court's findings establish that the same conduct that caused the injury

from misappropriation of trade secrets and tortious interference, was also the basis for the

Court's determination of the Debtor's breach of fiduciary duty.  See Kates II, 8 A.3d at 602-03.

The key point here is that Debtor engaged in a single course of related conduct that caused the

Plaintiffs' injuries.  Thus, all of the Compensatory Damages can be attributed to the Debtor's

misappropriation of the CB Trade Secrets and his use of them to tortiously interfere with CB's

contractual relationship with Pfizer.  This makes it unnecessary to allocate the Compensatory

Damages among the five (5) state court claims because the Compensatory Damages are, as a

whole, nondischargeable.  See In re Sarff, 242 B.R. 620 (B.A.P. 6th Cir. 2000) (reversing

bankruptcy court and holding that compensatory damages from breach of duty of loyalty arose

from same conduct as other nondischargeable damages constituting willful and malicious injury,

thus making them nondischargeable); In re Harland, 235 B.R 769, (Bankr. E.D. Pa. 1999)

(holding all amounts ancillary to §523(a)(4) claims, including breach of contract which occurred because of misappropriation of trade secrets, nondischargeable); In re Marks, 192 B.R. 379 (E.D. Pa. 1996) (affirming bankruptcy court determination that compensatory damages awarded for creditor's rights in corporation were nondischargeable as part of "a single course of willful and malicious conduct" and those damages were related to debtor's intentional interference with an economic opportunity claim against creditor).

For these reasons, I find that the entire compensatory damage award arose from the Debtor's willful and malicious behavior and is nondischargeable under §523(a)(6).

## V.  CONCLUSION

For the reasons set for above, the Plaintiffs have met their evidentiary burden of proving that the Sanctions Award and the Compensatory Damages should be held nondischargeable under §523(a)(6).   Accordingly, the Plaintiffs' Motion for Summary Judgment will be granted. An appropriate order will be entered.

Date:   December 18, 2012   
                                          **ERIC L. FRANK**
                                          **U.S. BANKRUPTCY JUDGE**